IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| INDYNE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:18-cv-756 (LMB/MSN) |
| ) | |
| BEACON OCCUPATIONAL ) | |
| HEALTH & SAFETY SERVICES, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Before the Court is plaintiff InDyne, Inc.'s Motion for Summary Judgment [Dkt. No. 10] and defendant Beacon Occupational Health & Safety Services, Inc.'s Motion for Extension of Time to Complete Discovery [Dkt. No. 15]. For the reasons that follow, plaintiff's Motion for Summary Judgment will be granted and defendant's Motion for Extension of Time to Complete Discovery will be denied.

## I. BACKGROUND

In this declaratory judgment action, plaintiff InDyne, Inc. ("plaintiff" or "InDyne") has moved for summary judgment, arguing that the Teaming Agreement between itself and its potential subcontractor, defendant Beacon Occupational Health & Safety Services, Inc. ("defendant" or "Beacon"), is unenforceable. Plaintiff's Memorandum in Support of its Motion for Summary Judgment ("Plaintiff's Memo") [Dkt. No. 11]. Defendant responds that the Court should either deny summary judgment or defer consideration of plaintiff's motion until discovery can be completed. Defendant's Motion for Extension of Time to Complete Discovery ("Defendant's Motion") [Dkt. No. 15].

The basic facts are not in dispute. InDyne submitted a proposal to the United States Air Force ("Air Force") for a contract to provide services and support for the Solid State Phased Array Radar System and proposed Beacon as a subcontractor to provide certain medical services. Complaint ("Compl.") ¶¶ 6–7 [Dkt. No. 1-1]. Before submitting the proposal to the Air Force, InDyne and Beacon entered into a teaming agreement ("Teaming Agreement"). Id. ¶ 8. The Teaming Agreement reads as follows:

> If, during the period of this agreement, a prime contract is awarded to the Prime [InDyne] as a result of the proposal, the Prime will, subject to the approval of the Customer [Air Force], if such approval is required under the terms of the Prime contract, regulations and applicable law, enter into negotiations with the Sub [Beacon] for a subcontract to be mutually agreed upon between the parties and subject to the stipulation that such an agreement be reached within a reasonable period of time. <u>The Prime will make every reasonable effort to subcontract to the Sub that portion of the work set forth in the attached Exhibit A of this agreement. Said work is to be performed by the Sub in accordance with the schedule and technical specifications, if any, and at a price, consistent with the Sub's bid proposal. The terms and conditions of the subcontract will be generally consistent with the terms and conditions in the prime contract.</u> It is agreed that said terms and conditions will not conflict with government rules, regulations and applicable law. Id., Exhibit 1 ¶ 6 (emphasis added).
>
> The agreement shall remain in effect until the first of the following shall occur: … (g) inability of the Prime and the Sub, after negotiating in good faith, to reach agreement on the terms of a subcontract offered by the Prime, in accordance with this agreement. Id. ¶ 13.
>
> If an agreement cannot be reached on the terms of the subcontract, the Prime may procure a subcontract for the tasks and items described in Exhibit A, through competition, including the Sub. However, <u>before a decision is made to initiate a competition, the Sub shall be notified in writing of the specific area in dispute and shall be afforded the opportunity to show cause why the subcontract should not be subject to competition.</u> Id. ¶ 15 (emphasis added).

InDyne was awarded the contract with the Air Force on March 5, 2018. Id. ¶ 11. On March 30, 2018, InDyne requested from Beacon a best and final offer for the scope of work to be included in the potential subcontract between InDyne and Beacon. Id. ¶ 12. Beacon replied on April 4, 2018 with a letter arguing that the Teaming Agreement is binding, and that InDyne must

negotiate in good faith and cannot demand pricing different than that previously submitted in its bid. Id. ¶ 13. On April 9, 2018, Beacon returned the subcontract InDyne had proposed, having filled in a price consistent with Beacon's final proposal, accepting all other provisions except a Termination for Convenience provision.[1] Defendant's Response in Opposition ¶ 10 ("Defendant's Response") [Dkt. No. 14]. On April 16, 2018, InDyne informed Beacon that it had awarded the subcontract to another bidder whose proposal included a lower price. Id. ¶ 13.

On April 16, 2018, InDyne filed its declaratory judgment action in the Fairfax County Circuit Court, and Beacon timely removed it to this Court based on diversity jurisdiction. Notice of Removal [Dkt. No. 1].[2] InDyne has now moved for summary judgment, arguing that the Teaming Agreement is an unenforceable 'agreement to agree.' Plaintiff's Memo at 1. Beacon opposes summary judgment and moves for discovery under Federal Rule of Civil Procedure 56(d). Defendant's Motion at 1.

## II. DISCUSSION

### A. <u>Standard of Review</u>

Summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a

---

[1] The Termination for Convenience provision read: "(a) For work under this Subcontract, contractor may terminate part or all of this Subcontract for its convenience for any reason by giving written notice to subcontractor. Contractor's only obligation shall be to pay subcontractor a percentage of the price reflecting the percentage of the Work performed prior to the notice of termination, plus reasonable actual costs that subcontractor can demonstrate to the satisfaction of Contractor using generally accepted accounting principles, that have resulted from the termination." Id.

[2] On April 19, 2018, Beacon filed a two-count complaint in the Anchorage Superior Court for the State of Alaska, alleging in Count One a breach of express and implied contractual obligations and in Count Two a violation of Alaska's Unfair Trade Practices Act. InDyne removed that complaint to the United States District Court for the District of Alaska on May 15, 2018. That civil action, 3:18-cv-00115-TMB, has been stayed pending resolution of this Motion for Summary Judgment.

3

matter of law." FED. R. CIV. P. 56(a). Although the Court must view the record "in the light most favorable to the non-moving party," Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 324 (4th Cir. 2012), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to overcome summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Am. Arms Int'l v. Herbert, 563 F.3d 78, 82 (4th Cir. 2009). Rather, a genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. Moreover, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment. Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). Instead, the dispute must be both "material" and "genuine," meaning that it must have the potential to "affect the outcome of the suit under the governing law." Id.

Under Federal Rule of Civil Procedure 56(c), "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record. . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." The court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion;" however, "those inferences must, in every case, fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (internal quotations and citations omitted).

Under Federal Rule of Civil Procedure 56(d), the court may defer or deny a motion for summary judgment or allow discovery if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." See also Strag v.

4

Bd. of Trs., Craven Cmty. Coll., 55 F. 3d 943, 951 (4th Cir. 1995). Generally, a district court must refuse summary judgment "where the nonmoving party has not had the opportunity to discover information that is essential to its opposition," Nader v. Blair, 549 F.3d 953, 961 (4th Cir. 2008) (citing Anderson, 477 U.S. at 250 n.5), as Rule 56(d) motions are "broadly favored and should be liberally granted." McCray v. Md. Dept. of Transp., Md. Transit Admin., 741 F.3d 480, 484 (4th Cir. 2014); however, requests pursuant to Rule 56(d) should be denied "if the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (discussing predecessor to Rule 56(d)). The sole issue involved in plaintiff's Motion for Summary Judgment is a question of law, not fact, therefore, defendant's argument that summary judgment should be postponed to allow for discovery is without merit.

### B. Analysis

It is "well settled under Virginia law that agreements to negotiate at some point in the future are unenforceable." Cyberlock Consulting, Inc. v. Info. Experts, Inc., 939 F. Supp. 2d 572, 578 (E.D. Va. 2013), aff'd per curiam, 549 F. App'x 211, 212 (4th Cir. 2014) ("Critically, Virginia courts have uniformly refused to enforce agreements to agree at a future date."); see also Zoroastrian Ctr. and Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y., 822 F.3d 739, 752 (4th Cir. 2016) ("Such 'agreements to agree' are uniformly unenforceable in Virginia."); CGI Fed. Inc., v. FCi Fed., Inc., 814 S.E.2d 183, 188 (Va. 2018); Navar, Inc. v. Fed. Bus. Council, 291 Va. 338, 347 (2016); Marketplace Holdings, Inc. v. Camellia Food Stores, Inc., 64 Va. Cir. 144, 2004 WL 2848405, at *2 (Feb. 27, 2004) (finding "several decisions from courts outside Virginia ... that have adopted the 'modern' rule that agreements to negotiate are enforceable" to be unpersuasive). In Virginia, "any writing in which the terms of a future transaction or later, more formal agreement are set out is presumed to be an agreement to agree

5

rather than a binding contract." Cyberlock, 939 F. Supp. 2d at 580. Naming an agreement something other than a 'contract,' such as a 'teaming agreement,' "implies that the parties intended it to be a nonbinding expression in contemplation of a future contract." Id. The name is not conclusive, and the agreement should be "read as a whole" to determine whether it was "meant to provide a binding obligation" or "to set forth a contractual objective and agreed framework for the negotiation of a subcontract in the future." Id. at 581. Agreements with terms "too vague and indefinite to enforce" are typically found to be unenforceable. W.J. Schafer Assocs. v. Cordant, 254 Va. 514, 519 (1997) (citing Allen v. Aetna Cas. & Sur., 222 Va. 361 (1981)).

Defendant works hard to distinguish this agreement from those addressed by these cases, by arguing that this agreement spoke in definite terms regarding (1) scope of work, (2) price, (3) commitment, and (4) duration and place of performance, Defendant's Response at 11–15, whereas none of the agreements discussed in the Virginia cases had all four elements settled. For example, Cyberlock, CGI, and Navar involved teaming agreements where the scope of work was a percentage of total work, rather than a specified set of services like the ones to be provided by this defendant. Id. Consequently, in those cases, the price term was also uncertain. Id. In this case, the price term was clearly set. Defendant's Response ¶ 10. In W.J. Schafer, the fact that there was "no agreed purchase price" weighed heavily against a finding of enforceability, but here, the price was fixed. 254 Va. at 520.

Plaintiff responds that the language of this Teaming Agreement only requires it to "enter into negotiations" and "make every reasonable effort to subcontract" to defendant. Compl., Exhibit 1 ¶ 6. This language is analogous to the language in prior agreements found

unenforceable. See Cyberlock, 939 F. Supp. 2d at 581; CGI, 814 S.E.2d at 188–89;[3] Navar, 291 Va. at 298. In addition, this Teaming Agreement contemplates that the subcontract may not come to fruition: "This agreement shall remain in effect until ... inability of the Prime and the Sub, after negotiating in good faith, to reach an agreement on the terms of the subcontract offered by the Prime, in accordance with this agreement." Compl., Exhibit 1 ¶ 13(g). This is a major factor to be considered by the Court as it determines whether this agreement is enforceable. See CGI, 814 S.E.2d at 189.[4]

In conclusion, much like in Cyberlock, where "admittedly there is some language" suggesting that the prime contractor was to provide a certain percentage to the subcontractor upon award of the contract, "the agreement read as a whole indicates that this particular language was not meant to provide a binding obligation but rather to set forth a contractual objective and agreed framework for the negotiation of a subcontract in the future along certain established terms." 939 F. Supp. 2d at 581. There, the Court held that "even if the parties are fully agreed on the terms of their contract, the circumstance that the parties do intend a formal contract to be drawn up is strong evidence to show that they did not intend the previous negotiations to amount to an agreement." Id. at 580. Although defendant makes a strong case that the Teaming Agreement is more definite than those found by courts to be unenforceable under Virginia law, "[w]ell-established precedent compels us not to impose a subcontract on parties to a teaming agreement when they have expressly agreed to negotiate the material terms of a subcontract in

---

[3] The agreement in CGI did make negotiations subject to "CGI's best and final proposal to FCi," id. at 186, whereas this agreement did not.

[4] Regarding a set termination date, the agreement in CGI terminated "if within 90 days of a prime contract award, the parties failed 'to reach agreement on the terms and conditions of a subcontract,'" id., whereas this agreement terminated "two years after effective date of this agreement." Compl., Exhibit 1 ¶ 13(h).

the future." Id. The parties chose to have Virginia law apply to the terms of the Teaming Agreement. Compl., Exhibit 1 ¶ 24. Under the clear precedent in Virginia, this Teaming Agreement is unenforceable.

III. CONCLUSION

For the reasons stated above, plaintiff's Motion for Summary Judgment will be GRANTED and defendant's Motion for Extension of Time to Complete Discovery will be DENIED by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 23rd day of October, 2018.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge